[L. A. No. 23700. In Bank. Dec. 9, 1955.]

CITY OF OXNARD, Petitioner, v. ETHEL DALE, as City Clerk, etc., et al., Respondents.

*Assigned by Chairman of Judicial Council.

Joseph W. Goss, City Attorney, O'Melveny & Myers, James L. Beebe and James W. Beebe for Petitioner.

William A. Reppy and F. Gile Tiffany, Jr., for Respondents.

GIBSON, C. J.—Petitioner, a municipal corporation of the sixth class, seeks a writ of mandate requiring respondent city treasurer to sign, and respondent city clerk to countersign, certain revenue bonds which the city proposes to issue pursuant to the Revenue Bond Law of 1941. (Gov. Code, § 54300 et seq.) ■ Mandamus is, of course, an appropriate remedy to compel respondents to sign the bonds, if the proposed issue meets the requirements of the law, since the acts demanded are ministerial duties. (*Cf. City of Fairfield* v. *Hutcheon,* 33 Cal.2d 475 [202 P.2d 745]; *California Toll Bridge Authority* v. *Kelly,* 218 Cal. 7 [21 P.2d 425].)

The sole question presented is whether the proposed bonds, and the statute under which they were authorized by the voters and the city council, are contrary to section 18 of article XI of the California Constitution, which provides, insofar as pertinent here: "No county, city, town, township, board of education, or school district, shall incur any indebtedness or liability in any manner or for any purpose exceeding in any year the income and revenue provided for such year, without the assent of two thirds of the qualified electors thereof, voting at an election to be held for that pur-

pose, nor unless before or at the time of incurring such indebtedness provision shall be made for the collection of an annual tax sufficient to pay the interest on such indebtedness as it falls due, and also provision to constitute a sinking fund for the payment of the principal thereof. . . ."

The city has owned a sanitary sewer system since 1905. The system and its additions and improvements were financed largely by the issuance of general obligation bonds, of which a total amounting to $795,200 remains outstanding and unpaid. Charges for use of the sewer system were first imposed in 1946, and since that time all expenses of operation and maintenance have been paid from sewer revenues. The revenues have been used, further, to pay part of the interest and principal on general obligation sewer bonds issued in 1949, but the city does not presently intend to continue to apply sewer revenues toward the retirement of these bonds.

A treatment plant, financed by a portion of the general obligation bonds referred to above, is now being constructed, and the city proposes to construct interceptor sewers to transport sewage to the treatment plant. Pursuant to the Revenue Bond Law of 1941 the city council, in March 1954, called a special election to submit to the voters the issuance of sewer revenue bonds in the amount of $450,000 to finance the construction of the interceptor sewers. It was specified that the bonds were to be payable exclusively from the revenues of the entire sewer system of the city, together with all additions and improvements thereafter made, and that the bonds were not to be secured by the taxing power of the city. The Revenue Bond Law of 1941 requires authorization of such bonds by a majority vote (Gov. Code, § 54386), and, since the election was called pursuant to that statute, it may be inferred that the bond measure was submitted to the voters upon the theory that only a majority vote was required. The bonds were approved at the ensuing election.

Subsequently the city council adopted a resolution authorizing the proposed bonds in accordance with the measure submitted to the voters. The resolution recites that issuance of the bonds was approved by more than a majority of the voters; that they are to be issued pursuant to the Revenue Bond Law of 1941 and are to be secured by a pledge and lien upon, and payable solely from, the gross revenues of the entire sewer system, including extensions later constructed; that the bonds are not a debt of the city; and that the bondholders cannot compel the exercise of the taxing power of the city or the forfeiture of any of its property.

The resolution further provides that the city is to covenant, among other things, that it will operate the system in an efficient manner and will prescribe sufficient charges for the services of the system to pay interest and principal on the bonds and the expenses of operation. Revenues are to be used, first, for payment of principal and interest on the bonds and then for current expenses of the system. Surplus funds can be invested or used to redeem the proposed bonds and, under some circumstances, may be used for other sewer purposes, including payment of principal and interest of general obligation bonds of the city issued for sewer purposes. No claim is made that the proposed bonds will in any way vary from the requirements of the Revenue Bond Law of 1941. Although it is not specifically alleged that the issuance of the proposed bonds, if considered as a debt of the city, will create an indebtedness in any year in excess of the income of the city for such year within the meaning of section 18 of article XI, this appears to be conceded and, further, may be inferred from the recital in the resolution authorizing the bonds that funds must be provided for the purpose of constructing the interceptor sewers.

 It is settled in California and recognized in almost all of the other states that, as a general rule, a constitutional provision such as section 18 of article XI is not violated by revenue bonds or other obligations which are payable solely from a special fund, provided the governmental body is not liable to maintain the special fund out of its general funds, or by tax levies, should the special fund prove insufficient. (*Department of Water & Power* v. *Vroman,* 218 Cal. 206, 216 et seq. [22 P.2d 698]; *California Toll Bridge Authority* v. *Kelly,* 218 Cal. 7, 10 et seq. [21 P.2d 425]; *In re California Toll Bridge Authority,* 212 Cal. 298, 302 et seq. [298 P. 485] [discussing many cases from other jurisdictions]; *Shelton* v. *City of Los Angeles,* 206 Cal. 544, 548 et seq. [275 P. 421]; see *Garrett* v. *Swanton,* 216 Cal. 220, 227 et seq. [13 P.2d 725]; 38 Am.Jur. 150 et seq.) As pointed out in the case of *In re California Toll Bridge Authority, supra,* 212 Cal. at page 302, such an obligation is not considered to be an indebtedness or liability of the political subdivision or agency issuing the bonds, within the meaning of the constitutional limitation.

The cases in California are not entirely clear as to the extent of the operation of the special fund doctrine, and there is a conflict of authority on the subject in other states. Some of the courts in other jurisdictions have held that

revenue bonds payable solely from a special fund will not be free from the constitutional limitation unless the fund is restricted to the revenues from the particular improvement which is to be constructed out of the proceeds of the bonds in question, but under the prevailing view the doctrine may be applicable where the revenues of the entire existing system, as well as those of the proposed improvement, are pledged. (See Joint Report of Committees of the American Society of Civil Engineers, the Section of Municipal Law of the American Bar Association and others (1951), 12 Ohio State L.J. 147, 182 et seq.; 38 Am.Jur. 155-156.)

The first case in California discussing this problem is *Garrett* v. *Swanton*, 216 Cal. 220 [13 P.2d 725], where a city agreed to purchase a pumping plant on a conditional sales plan, with payments to be in installments over a period of years out of a special fund maintained by profits from the entire water system. There, as here, the city had previously issued general obligation bonds to finance the system, and, by ordinance, water revenues were being used for the payments on the bonds. It was held that the special fund doctrine was inapplicable under the facts of the case and that the contract was in violation of section 18 of article XI. The court said that the contract indirectly created a general liability of the city, and it reasoned that any deficiency of revenue would require the taxpayers to contribute to the water fund, from which both the contract and the bonds were being paid, in order to make the payments on the bonds. The court also stated, in effect, that the possibility of a forfeiture under the conditional sales contract might make it necessary for the city, if it wished to protect its investment, to pay contract installments from general funds and that the creation of this inducement amounted to a violation of the Constitution. (*Cf. In re City & County of San Francisco*, 195 Cal. 426, 438-442 [233 P. 965]; *Chester* v. *Carmichael*, 187 Cal. 287, 291-294 [201 P. 925].) In the present case, however, the resolution authorizing the proposed revenue bonds specifies that the bondholders shall have no right to cause the forfeiture of any property of the city.

Two subsequent decisions of this court, while distinguishing the Garrett case on its facts, have departed from its reasoning insofar as it may be applicable here. (*Department of Water & Power* v. *Vroman*, 218 Cal. 206 [22 P.2d 698]; *California Toll Bridge Authority* v. *Kelly*, 218 Cal. 7 [21 P.2d 425]; see also *City of Glendale* v. *Chapman*, 108 Cal.App.2d 74, 80 et seq. [238 P.2d 162]; *cf. Board of State Harbor Comrs.* v.

*Dean,* 118 Cal.App.2d 628, 632 et seq. [258 P.2d 590].) The Kelly case involved revenue bonds authorized by the toll bridge authority and payable out of a special fund consisting of revenues from the operation of a bridge to be built from the proceeds of the bonds. The director of public works refused to sign the bonds upon the theory that they were rendered invalid by certain legislation adopted after they had been judicially approved. This legislation contemplated the appropriation of money, for purposes of building approaches and maintaining and operating the bridge, from existing special funds for highway construction and maintenance. (218 Cal. at p. 14.) In holding that the plan did not violate section 1 of article XVI of the Constitution, prohibiting creation by the state of debts or liabilities in excess of $300,000 without a vote of the people, this court rejected contentions that the practical and ultimate result of the legislation would be to convert the bonds into general obligations of the state and that the state, in effect, would be compelled to protect its property by general fund expenditures. After pointing out that payment of the bonds was secured only by the revenues collected from the particular bridge for which the bonds were issued, the court said, "While it may be to the interests of the state, in the event of necessity, to make contribution for the preservation of the bridge, the better to conserve the amount of funds it has spent in assisting the consummation of the enterprise, it does not follow that the bonds themselves will be thereby converted into a liability against the general funds of the state." (218 Cal. at p. 13.) Further, the court said that even if the statutes had purported to pledge the construction and maintenance funds for operation and maintenance of the bridge, such action would not constitute the pledging of the credit of the state because the construction and maintenance funds were special funds. (218 Cal. at p. 14.)

The language in the Kelly case (218 Cal. 7, 13-14) appears to be inconsistent with the position taken in the Garrett case (216 Cal. 220) to the effect that the Constitution was violated because an economic or practical necessity might arise which would require the taxpayers to contribute money in order to protect the city's investment if the special fund should prove to be inadequate. ■ Moreover, there is nothing in section 18 of article XI which suggests that the economic advisability of making such an expenditure is tantamount to an "indebtedness or liability." ■ The quoted words obviously refer only to a legally enforceable obligation, and

where, as here, the terms of the bonds expressly limit liability to the revenues of the system, there can be no such obligation to the bondholders upon the part of the city or its taxpayers, because the bonds provide in effect that the bondholders assume the risk that the system may prove unable to produce sufficient revenue. The covenant of the city to impose charges for sewer services adequate to cover bond payments and expenses of the system does not amount to a guarantee that the system will be successful, and the covenant is not contrary to section 18 of article XI because it does not create a financial liability, measurable in terms of the city's annual income. (*City of Glendale* v. *Chapman,* 108 Cal.App.2d 74, 80 [238 P.2d 162] ; *cf. Shelton* v. *City of Los Angeles,* 206 Cal. 544, 551-552 [275 P. 421].)

In the Vroman case (218 Cal. 206), the Department of Water and Power of the City of Los Angeles proposed to enter into a contract with the Reconstruction Finance Corporation to borrow money to finance the construction of lines and other facilities to transmit electricity from the Colorado River, and, under the contract, the loan was to be repaid solely from the revenues of the entire electric system of the city. General obligation bonds had previously been issued by the city, and, as in the present case, the revenues of the system had been used to meet payments of interest and principal due on the general bonds. It was held that the contract was valid and that the loan was in no sense an obligation of the city within the meaning of section 18 of article XI. The objecting party urged that the loan was to be repaid out of revenues from the existing electrical system as well as out of revenues from the proposed transmission lines and that for this reason the Constitution was violated. The court, however, stated that it attached no particular significance to the objection and added that if the argument had any importance it was in connection with another objection to the effect that the fund might prove to be inadequate and the taxpayers might be required to meet the sums to become due on the general bonds theretofore issued. (218 Cal. at pp. 218-219.) With respect to the latter contention the court stated that if the funds of the department should become depleted, the taxpayers might be called upon to provide revenues to make payments on the general bonds, but that "the electors in authorizing those bonds bound the taxpayers constitutionally to meet those payments and nothing has occurred since the issuance thereof which would relieve them of that burden. . . ."

■ It follows that, in the present case, the former practice of the city to use the revenues from the sewer system to make payments on the general obligation bonds has no bearing upon the question whether the incurring of a subsequent obligation to be paid solely from those revenues, in priority to the general bonds, will violate section 18 of article XI. ■ It may be noted, in this connection, that in the absence of some specific statutory or contractual provision the city could properly reduce or discontinue the imposition of charges for use of its sewer system and arrange for the assessment of taxes to make the payments on its general bonds. Since the city may terminate use of sewer revenues as a means of servicing the general bonds, it is, of course, immaterial that the city, at the same time, pledges the revenues for the payments to be made on an issue of revenue bonds.

As we have seen, an obligation which is payable out of a special fund is not an "indebtedness or liability" of a governmental body within the meaning of section 18 of article XI of the Constitution if the governmental body is not required to pay the obligation from its general funds, or by exercise of its powers of taxation, should the special fund prove insufficient. ■ Respondents concede, as they must, that the special fund doctrine would be applicable and controlling here if the revenues pledged to secure the proposed bonds were secured by the revenues to be produced from the interceptor lines alone. Insofar as concerns the constitutional limitation, we can see no sound reason to distinguish between that situation and the one presented here where the pledge consists of the revenues of the entire system and where those revenues had formerly been used to make payments on the city's general obligation bonds. *Garrett* v. *Swanton*, 216 Cal. 220 [13 P.2d 725], is overruled to the extent that it is inconsistent with the views expressed herein. Accordingly, the proposed bonds, and the statutes under which they were authorized, are valid, and respondents are required to sign the bonds as demanded by petitioner.

It is ordered that a peremptory writ of mandate issue as prayed.

Shenk, J., Carter, J., Traynor, J., Schauer, J., Spence, J., and McComb, J. pro tem.,* concurred.

*Assigned by Chairman of Judicial Council.